## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| **DUNKIN DONUTS FRANCHISING** | : | |
| **LLC, et al.,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 14-2293** |
| | : | |
| **CLAUDIA III, LLC, et al.,** | : | |
| **Defendants.** | : | |

---

### MEMORANDUM

**MCHUGH, J.**                                                      **August 11, 2014**

### I.     Introduction

This matter is before the court on a motion for a preliminary injunction. The central question presented is whether a retail franchisee's failure to timely remodel its store constitutes irreparable harm to the franchisor. Specifically, plaintiff Dunkin Donuts Franchising, LLC and related companies (collectively, "Dunkin"), brought this action against one of their franchisees, Claudia III, LLC, as well as the franchisee's members, Manfred and Lynn Marotta. ("Claudia"). Dunkin contends that Claudia breached its franchise agreement by failing to complete renovations within a contractually required schedule. This breach, Dunkin argues, negates the franchise agreement, and necessarily renders Claudia's continued operation of its store a violation of Dunkin's trademarks, constituting irreparable harm as a matter of law. It seeks a preliminary injunction prohibiting Claudia from continuing to operate under the Dunkin name,

which would of course require Claudia to close its store completely. Because I conclude that irreparable harm has not been shown, the motion for a preliminary injunction is denied.

## II.   Findings of Fact

### a.  Parties

Plaintiff Dunkin Donuts Franchising, LLC, is a limited liability company with its principal place of business in Canton Massachusetts. Plaintiffs DD IP Holder, LLC and BR IP Holder, LLC are limited liability companies; they hold the registrations of the trademarks "Dunkin' Donuts" and "Baskin-Robbins," respectively. Plaintiff Baskin-Robbins Franchising, LLC is a Delaware company with a principal place of business in Canton, Massachusetts. Collectively, these companies operate a large franchise system across the United States. They license independent businesses to use Dunkin's and Baskin's well-known trademarks and other intellectual property and sell food and beverage products that Dunkin and Baskin develop.

Defendant Claudia III, LLC, is a limited liability company in Pennsylvania. Claudia III operates the Dunkin Donuts franchise that is at issue in this case. Defendants Manfred Marotta and Lynne Marotta are Pennsylvania residents and own Claudia III.

### b.  The Franchise Agreement

On July 16, 2009, Dunkin and Claudia III executed an agreement establishing the terms under which Claudia III would operate a Dunkin Donuts and Baskin-Robbins franchise in Perkasie, Pennsylvania.[1] The agreement granted Claudia III a license to operate a store selling

---

[1] Franchise Agreement, Plaintiffs' Exhibit 1.

Dunkin Donuts and Baskin-Robbins food products and using plaintiffs' intellectual property, including trademarks, patents, and copyrights.[2] In return Claudia III accepted a number of obligations. These obligations touched many aspects of running the business and included paying franchise and advertising fees,[3] participating in training,[4] and adhering to bookkeeping and reporting standards.[5] The agreement also outlines notice and cure procedures through which Dunkin may terminate the agreement upon a franchisee's breach.

This dispute focuses on the renovation requirement in the agreement. Section 8.1 of the Franchise Agreement's Terms and Conditions requires the franchisee to "refurbish the Store in accordance with [Dunkin's] then-current Standards."[6] Claudia III, the franchisee, had the obligation to complete and pay for the renovation. Dunkin retained significant control over how a franchisee could accomplish the renovation:

> You agree that the Store […] must be designed, laid out, constructed, furnished, and equipped to meet our Standards [….] Any deviations from our plans, specifications and requirements must have our prior written approval.[7]

When the parties signed the agreement in 2009, the remodel was due to be completed by June 5, 2013.[8] Significantly, except for its failure to meet the deadline for remodeling, based on the record, I conclude that Claudia has otherwise met all of its obligations under the agreement.

### c. Beginning Renovations

---

[2] Franchise Agreement, Plaintiff's Exhibit 1, Terms and Conditions § 2.
[3] Franchise Agreement, Contract Data Schedule.
[4] Franchise Agreement Terms and Conditions § 4.
[5] Franchise Agreement Terms and Conditions § 11.
[6] Franchise Agreement Terms and Conditions § 8.
[7] Franchise Agreement Terms and Conditions § 3.
[8] Franchise Agreement Contract Data Schedule.

Claudia III began planning the renovations in the spring of 2013, working with Edward Mack, Dunkin's construction manager for most of Pennsylvania. Dunkin provided a design concept to the store in April. In June, Dunkin and Claudia III received a quote for services from one of the approved architects, but both agreed the price was unreasonably high. Dunkin suggested another firm from its list of approved architects, A & A Architects, which quoted a much more sensible price and was hired. The architect, Mr. Mazumdar, created and submitted a set of plans based on Dunkin's design to the township he believed had the authority to grant a building permit for the remodel.[9]

### d.  Unforeseen obstacles

The remodel process hit a wall, so to speak, in the fall of 2013. Mr. Mazumdar received comments from the township in September asking for further information before a building permit could be issued.[10] The township's comments included a request for proof of Department of Health approval of layout plans.[11] Then a "well stub," the plugged top of a drinking water well, was discovered in one of the locations proposed for a bathroom in the remodeled store. Unsurprisingly, the notion of placing a bathroom over a source of fresh drinking water was problematic for the Department of Health. It concluded that the bathroom would have to be relocated, and the plans for the remodel would need to be revised.

The parties engaged in a series of inconclusive communications to resolve the problem. Mr. Marotta suggested removing one of the bathrooms, but the architect replied that removing a

---

[9] In fact, as discussed below, the plans were originally submitted to the wrong township.
[10] Plaintiffs' Exhibit 4.
[11] Plaintiffs' Exhibit 4.

bathroom was impermissible given the amount of customer seating the store planned to offer.[12] Mr. Marotta also inquired about extending the pipe through the ceiling.[13] The architect countered that he was considering putting the stub in a closet.[14] Mr. Marotta asked Mr. Mack, the construction manager, for assistance, but Mr. Mack referred Mr. Marotta to Mr. Mazumdar.[15]

Consequently, the well stub issue remains unresolved. Mr. Marotta conceded that ultimately someone must decide how to remove the well stub from the bathroom, and he admitted that the decision is at least partly up to him.[16] It may be that the bathroom can be relocated after Dunkin approved Marotta's request to remove a Baskin-Robbins freezer from his store in February 2014.[17] Nonetheless, the record does not indicate if Mr. Marotta has actually tried to get revised plans since Dunkin made that decision. Until Marotta, Dunkin, and the architect decide how to resolve the well stub issue and draw up new plans, the Health Department cannot approve the layout, the building permit cannot issue, and the renovations cannot begin.

### e.   Unclean Hands at the Donut Shop?

Responsibility for the delay lies at least in part with Mr. Marotta, but actions by parties on all sides of this dispute contributed to the delays that held up, and still hold up, the remodel. Dunkin Donuts has a number of practices and policies that have made it difficult for the franchisee to satisfy his obligations in a timely manner. Dunkin argues that the franchisee is

---

[12] Plaintiffs' Exhibit 8.
[13] Plaintiffs' Exhibit 8.
[14] Plaintiffs' Exhibit 8.
[15] Plaintiffs' Exhibit 8.
[16] Transcript of Preliminary Injunction Hearing on June 23, 2014 at 113 (Direct of Manfred Marotta) ("the resolution had to come between myself, the architect or Dunkin [...] it had to be a group effort to get this to move forward.").
[17] Defendants' Exhibit 9.

responsible for renovating according to timelines that Dunkin sets, and yet maintains a

significant degree of control over critical phases of remodeling projects. The plans for the

remodel must come from Dunkin itself, and Dunkin must approve any changes. Mr. Marotta

requested one change to his store—removing a Baskin Robins freezer—in October 2012.[18]

Dunkin did not approve the request until February 2014.[19]

      Dunkin had its own independent relationship with A & A Architects, which has done

more than one hundred Dunkin remodels. Though Dunkin maintains that Mr. Mazumdar was

strictly Claudia's architect, it is clear that Dunkin and the architect communicated directly about

the remodel.[20] Of note, Mr. Mazumdar originally submitted plans to the wrong township, and

was abroad for the entire month of December, 2013—facts learned by Claudia for the first time

during this litigation. At least some of the responsibility for Mr. Mazumdar's delays should be

borne by Dunkin, which supplies its franchisees with an approved list of architects.

      I also note that the well stub caused a delay that none of the parties foresaw or reasonably

could have foreseen. Mr. Mack, Dunkin's construction manager responsible for central and

eastern Pennsylvania, and Mr. Mazumdar, an architect who worked frequently with Dunkin, both

explained they had never encountered a similar obstacle in any other Dunkin remodel.[21] The well

stub did not appear on any of the documents that were used to plan the remodel. Dunkin's

internal store planning team designs location layouts,[22] and as Claudia inherited the original

space from a prior franchisee,[23] presumably Dunkin designed the store that Claudia came to

---

[18] Declaration of Mr. Marotta, Doc. 13-4.
[19] Defendants' Exhibit 9.
[20] See Defendants' Exhibit 4, "Ed Mack spoke to your architect this morning and he is to reply to the [township's] comments by the end of business Friday, 10/4/13"; Plaintiffs' Exhibit 5 (conversation between architect and Ed Mack without Marotta's participation).
[21] Transcript of Preliminary Injunction Hearing on June 23, 2014 at 71 (Direct of Edward Mack).
[22] Transcript of Preliminary Injunction Hearing on June 23, 2014 at 63 (Direct of Edward Mack).
[23] Transcript of Preliminary Injunction Hearing on June 23, 2014 at 22 (Cross of Jean Mazzotta).

operate, but Dunkin never discovered the well stub. Years later Dunkin also designed the remodel, but was apparently still ignorant of the existence of the well stub. I do not accept Dunkin's argument now that the delay the well stub caused to the remodel is entirely Claudia's responsibility. Once again, Dunkin shares at least some of the responsibility for these complications.

### f.   The Status Quo

Dunkin and Claudia III are now at loggerheads. Dunkin issued a termination of the franchise agreement and currently insists that Claudia III is no longer a franchisee. According to Dunkin, Claudia III is pirating its intellectual property by continuing to use its name and trade dress, and irreparably injuring its good name by operating a store with out-of-date décor. Claudia III responds that it has complied with its contract to the extent it can, meeting all of its obligations except for the remodel. Claudia III continues to operate as a franchise and pay the fees required in the Franchise Agreement, which Dunklin continues to accept.

### III.    Consideration of the Injunction

A preliminary injunction is an equitable remedy that a court should not grant lightly. *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) ("Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances"). The court must consider (1) the likelihood that the moving party will succeed on the merits of claims, (2) the extent to which the moving party would be irreparably harmed without an injunction, (3) the extent to which the non-moving party would suffer irreparable harm if the court issues the preliminary injunction, and (4) the public interest. *Bimbo Bakeries USA v. Botticella*, 613 F.3d

102, 109 (3d Cir. 2010); *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 191-92 (3d Cir. 1990).

### a.   Likelihood of Success on the Merits

For a franchisor to prove that a franchisee is engaged in unauthorized use of intellectual property, the franchisor must show that the franchise agreement containing the license to use the marks was properly terminated. *S & R Corp. v. Jiffy Lube*, 968 F.2d 371, 379 (3d Cir. 1992); *7-Eleven Inc. v. Upadhyaya*, 926 F.Supp.2d 614, 626 (E.D. Pa. 2013). Here, Dunkin ultimately has the right to terminate the agreement if the obligation to remodel remains unfulfilled.  That termination would render continued use of the trademark unlawful, and a plaintiff can prevail on a trademark infringement claim under § 32 of the Lanham Act by showing unauthorized use of valid trademarks without the need to prove actual consumer confusion. *S & R Corp., supra,* 968 F.2d at 375(holding that because franchisee defendant was using the franchisor plaintiff's mark, "there is no question […] that their concurrent use is highly likely to cause consumer confusion") (citing *Opticians*, 920 F.2d at 192).

Based on the record before me, I believe it is reasonably likely that plaintiffs will be able to show that they properly terminated the defendant's franchise agreement. Following the terms of the franchise agreement, the plaintiffs sent the defendant multiple notices to cure default of late remodeling.[24] Unquestionably the remodel is not finished. It is not clear to me that Claudia will be able to prove that its failure to perform was caused by Dunkin's failure to meet its obligations. It is possible that the defendants could prevail on counterclaims for Dunkin's role in this default, but even a successful counterclaim would not mean the agreement was not 'properly

---

[24] Plaintiffs' Exhibits 7 (Nov. 13, 2013), 10 (Feb. 25, 2014), and 11 (March 7, 2014).

terminated.' Because it is likely Dunkin will be able to show proper termination of the defendant's franchise agreement, it follows that it will likely succeed on the trademark infringement claim as well.

### b.  Irreparable Harm to Plaintiffs

Although I find Dunkin likely to succeed on the merits of its claims, I am not persuaded it will suffer irreparable harm without a preliminary injunction.

Regarding the defendants' likely trademark infringement, the plaintiffs are correct that, to date,  the Third Circuit has applied the rule that a party is entitled to a presumption that it would suffer irreparable harm after a finding of trademark infringement. For example, in *Kos Pharmaceuticals v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004), the Court of Appeals, after finding that the plaintiff had shown a likelihood of success on the merits of a trademark infringement claim, went on to state: "as we have already found that Kos has shown a likelihood of success, we hold it is entitled to a presumption that it will suffer irreparable harm absent an injunction."

However, a growing number of courts have recognized that the Supreme Court's decision in *eBay v. MercExchange*, 547 U.S. 388 (2006) appears to have prohibited courts from applying this automatic presumption to circumvent the traditional equitable test for issuing a preliminary injunction. In *eBay,* the party seeking the injunction demonstrated that eBay likely infringed one of its patents. The Court of Appeals for the Federal Circuit, relying on the same principles that Dunkin invokes here, applied the "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances." *Id.* at 390. The Supreme Court

reversed, holding that the traditional four-part test for injunctive relief still applied to intellectual property claims litigated under the Patent Act. *Id.* at 393.

Several circuit court decisions have held that *eBay*'s reasoning requires courts not to presume irreparable injury in other intellectual property contexts. The Ninth Circuit read *eBay* as ending the presumption in claims under the Copyright Act. *Perfect 10 v. Google*, 653 F.3d 976, 980-81 (9th Cir. 2011) ("[N]othing in the statute indicates congressional intent to authorize a 'major departure' from 'the traditional four-factor framework that governs the award of injunctive relief."). The Ninth Circuit also ended the presumption in trademark cases such as this one. *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013). The Second Circuit reached the same conclusion in the trademark infringement context. *Salinger v. Colting*, 607 F.3d 68, 78 n.7 (2d Cir. 2010) ("we see no reason that eBay would not apply with equal force to an injunction in any type of case"). *See also Swarovski v. Bldg No. 19*, 704 F.3d 44, 54 (9th Cir. 2013) (noting that *eBay* may invalidate the presumption but not deciding the issue); *N.Am.Med.Corp. v. Axiom*, 522 F.3d 1211, 1228 (11th Cir. 2008) (same); *Paulsson Geophysical Servs. Inc. v. Sigmar*, 529 F.3d 303 (5th Cir. 2008) (same).

The Third Circuit has not yet decided whether *eBay* eliminates the presumption of irreparable harm upon demonstrating a violation of intellectual property rights. In *7-Eleven v. Upadhyaya*, 926 F.Supp.2d 614, 630 (E.D. Pa. 2013), Judge Dubois recognized the likelihood that *eBay* has changed the law, without finding it necessary to reach the issue. In *Buzz Bee Toys, Inc. v. Swimways Corp.*, No. 14-1948, 2014 WL 2006799 (D.N.J. 2014), however, Chief Judge Simandle concluded that *eBay's* precepts are now controlling.

Given the reasoning of the Supreme Court in *eBay*, I conclude that it prohibits me from presuming irreparable harm in this case. The holding in *eBay* was based on the Court's reading

of the Patent Act. The Patent Act includes as one remedy for infringement that the court "may" grant an injunction. The Supreme Court concluded that Congress intended courts to follow traditional equity principles, rather than authorizing courts to grant automatic injunctions to parties that are successful on the merits of an infringement claim.

In this case, the Plaintiffs allege a violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114. The Act states that a person who uses a registered mark in a way that is likely to cause confusion or deceive "shall be liable in a civil action for the remedies hereinafter provided." § 1114(1).

Section 1116 grants courts authority to issue injunctions as an infringement remedy. Paragraph (a) reads, in part:

> **The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable**, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title.

15 U.S.C.A. § 1116 (West) (emphasis added). The language emphasized is almost identical to the language the Supreme Court relied on in *eBay*:

> The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable.

35 U.S.C.A. § 283 (West); *eBay*, 547 U.S. at 391-92.

The Supreme Court found that the language in 35 USC § 283 reflected no Congressional intent to disturb the traditional four-part injunction test. *eBay*, 547 U.S. at 391-92. The key language in the Lanham Act is nearly identical, supporting the conclusion that in drafting Section 1116, Congress likewise had no intent to disturb the traditional injunction test.

Therefore, to follow the Supreme Court's decision in *eBay*, I must independently evaluate whether Dunkin has in fact established it will suffer irreparable harm absent a preliminary injunction.

Courts have found irreparable harm to trademark holders when the trademark owner faced a "loss of control of reputation, loss of trade, and loss of goodwill." *S & R Corp,* 968 F.2d at 378. In *S & R Corp,* the franchisee had modified the trademarks and business practices mandated by the franchisor, leaving the court to find that such innovation caused the plaintiff to lose control of its intellectual property. *Id.* In the instant case, the defendants continue to operate their Dunkin Donuts store according to Dunkin Donuts' rules and procedures. There is no indication that sales have suffered in any way. Inspections of the franchise by Duncan have not revealed any problems with respect to product identity or quality control. The only deviation is the remodel that Dunkin requires. The premises are not in disrepair, and the most that can be said is that Dunkin customers are not experiencing the "next generation" of Dunkin Donuts decor. At argument, counsel for Dunkin conceded that the current generation of Dunkin franchises provides customers with an enjoyable and quality experience.[25]

Courts also find irreparable harm when money damages cannot adequately compensate a plaintiff. *E.g., Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000) (finding no irreparable harm to a plaintiff who could be compensated with money damages). Because Claudia is operating in conformity with Dunkin's rules, other than the delayed remodel, I find that any damages Dunkin may be suffering are compensable with damages.

### c.  Irreparable Harm to Defendants

---

[25] Transcript of Preliminary Injunction Hearing on June 23, 2014 at 164-65.

A plaintiff seeking a preliminary injunction "must also show that its benefits from a preliminary injunction are not outweighed by irreparable injury to [defendants]." *S & R Corp*, 968 F.2d at 379. I conclude Dunkin has not carried this burden.

I reject Dunkin's argument that any harm Claudia would suffer should be discounted because such harm would be a consequence of Claudia's own wrongful conduct, relying on *Opticians*, *supra,* and cases citing it. 920 F.2d at 197 ("By virtue of this recalcitrant behavior, the IOA can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself."). I do not read *Opticians* as establishing a *per se* rule. In *Opticians*, a group of "schismatic" opticians split from the Opticians Association of America (OAA) to form the Independent Opticians of America (IOA). *Id.* at 191. The upstart IOA insisted on using trademarks owned by the OAA, arguing they were not trademarks at all, but in fact certification marks. The Third Circuit ruled that the IOA had likely infringed OAA trademarks. *Opticians*, *Id.* at 192-95. When weighing the hardships that a preliminary injunction would impose on the rebels of the IOA, the Third Circuit reasoned that the IOA had made a deliberate decision to use infringing marks, and could therefore not be heard to complain that an injunction would be too damaging. *Rita's Water Ice, Rita's Water Ice Franchise Corp. v. DBI Investment Corp.*, No. 96-306, 1996 WL 165518 (E.D. Pa. 1996), another case cited by Dunkin, also dealt with a willful infringement. Defendants there operated a Rita's Water Ice franchise and had signed an agreement that defined exactly what food and beverage products the franchise might sell. *Id.* at *2. In direct violation of the contract, the defendants were caught selling hot dogs and other unapproved products. *Id.* The court granted injunctive relief in favor of the franchisor, discounting any harm the defendants might suffer because the defendants consciously chose to sell the unauthorized products. *Id.* at *5.

The situation here is distinguishable. Claudia is not using Dunkin's marks after intentionally separating from the franchisor and forming a new entity as in *Opticians.* Nor is Claudia intentionally selling unauthorized merchandise as in *Rita's*. Instead, Claudia continues to operate a Dunkin franchise according to Dunkin's rules, and pay franchise fees, deviating only in that a required remodel was delayed.

For Claudia, entry of an injunction would be a death knell. An injunction would deprive Claudia of any income and leave them with the costs of maintaining the store. A closure would also drive customers to competitors, and the customer base might not return if the store reopens. Given the nature of the infringement in question, the harm to Claudia if an injunction is issued far outweighs any harm to Dunkin stemming from Claudia's continued operation of the existing store.

At the hearing on the injunction, over Claudia's objection, Dunkin submitted evidence suggesting that Claudia lacks the financial resources to accomplish the remodeling under the franchise agreement. For present purposes, I accept Claudia's position that such evidence is not relevant to my decision whether to grant preliminary relief.

### d.  Public Interest

The public interest does not weigh in favor of granting a preliminary injunction. Plaintiffs have not alleged defendants are operating their franchise in a fraudulent manner. *See Upadhyaya*, 926 F.Supp.2d at 631. Nor have plaintiffs alleged that leaving the store open as litigation proceeds presents any safety hazards.

Dunkin argued that "the public interest is served by fulfilling the contractual interests of the parties and maintaining the viability of the franchise system." *Maaco Franchising Inc. v.*

*Augustin*, No. 09-4548, 2010 WL 1644278, at *5. In *Maaco,* however, the franchisee entirely failed to perform under the agreement, specifically failing "to make payments [..] report their weekly gross receipts, or make their advertising contributions." *Id.* at *2. Given that Claudia has otherwise performed under the agreement, "the contractual interests of the parties and maintaining the viability of the franchise system" will be better served by maintaining the status quo and allowing the litigation process to run its full course.

In short, to the extent that "America runs on Dunkin," I am not persuaded that having its customer base continue to run to Claudia's Perkasie location constitutes irreparable harm.

**IV.    Conclusion**

Balancing the equities discussed above, I conclude that the plaintiffs have not carried their burden. Accordingly, I will maintain the status quo and deny the preliminary injunction plaintiffs have requested. Because I have decided not to grant the preliminary injunction, I do not need to consider at this time whether to enforce the covenant not to compete. An appropriate order follows.


_____/s/ Gerald Austin McHugh
United States District Court Judge